**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

PATRICK J. GRIFFIN, III        :

                                     :

v.                           :   Civil Action WMN-00-2837

                                     :

DEPARTMENT OF VETERANS AFFAIRS, :

et al.                           :

FILED
DISTRICT COURT

2001 JAN 29  P 4:

**MEMORANDUM**

This action is before the Court on Plaintiff's Motion for
Preliminary Injunction (Paper No. 3).  Defendants have opposed
the motion, and have also moved for summary judgment (Paper No.
7).  The issues have been fully briefed and a hearing, going both
to the request for a preliminary injunction and the merits, was
held on November 30, 2000.

**I.    BACKGROUND**

Point Lookout Confederate Cemetery ("Point Lookout"),
located in St. Mary's County, Maryland, was the site of the Point
Lookout prison camp operated by the United States during the
Civil War.  Complaint at ¶9.  Point Lookout contains a mass grave
of approximately 3,300 Confederate soldiers who died while
imprisoned at Point Lookout.  Id.  The grave is marked by an
"eighty-five foot granite monument ["Federal Monument"], erected
and maintained by the United States."  Opp. at 1.  Around the
base of the Federal Monument are "twelve bronze plaques bearing
the names of Confederate Prisoners known to have died at Point
Lookout," as well as a bronze plaque indicating, among other

MICROFILMED
0

1



things, that the monument was erected by the United States.  Opp.
at 6.  Point Lookout also contains a smaller state monument.  The
only other permanent display at Point Lookout is a U.S. flag,
which flies on a permanent flagpole at all times, illuminated
between sunset and sunrise.  Surrounding Point Lookout is a five-
foot-high, wrought-iron fence, see Opp. at 5, with a bronze
plaque at the entrance identifying the property as "Point Lookout
Confederate Cemetery."  Motion at 6.

     The entrance to Point Lookout is less than 30 feet from a
state highway.  Both monuments and the U.S. flag are visible from
the road, as is the bronze entrance plaque identifying Point
Lookout.  Approximately eight-tenths of a mile from Point Lookout
is the State of Maryland's Point Lookout State Park, which
includes a Civil War museum and other attractions.  See Opp. at
6.

     Point Lookout was the property of the State of Maryland
until ownership was transferred to the U.S. government in 1910.
Point Lookout is currently owned and controlled by the Department
of Veterans Affairs ("VA") through the National Cemetery
Association ("NCA").  To facilitate the management of national
cemeteries, the VA and NCA have promulgated various regulations
regarding the operation and use of such cemeteries, including
Point Lookout.  These regulations (collectively referred to as

2

the "Flag Restrictions") include 38 C.F.R. § 1.218(a)(14),[1] which
addresses demonstrations at VA facilities generally, and the
National Cemetery Service Handbook 3220 ("Flag Manual")[2] and a

---

[1] 38 C.F.R. § 1.218(a)(14) states in pertinent part:

(a) Authority and rules of conduct.  Pursuant to 38 U.S.C. §
901, the following rules and regulations apply to all
property under the charge and control of VA (and not under
control of the General Services Administration) and all
persons entering in or on such property.  The head of the
facility is charged with the responsibility for the
enforcement of these rules and regulations ...
(14) Demonstrations

(i) All visitors are expected to observe proper standards of
decorum and decency while on VA property.  Toward this end,
any service, ceremony, or demonstration, except as
authorized by the head of the facility or designee is
prohibited....

(ii) For the purpose of the prohibitions expressed in this
paragraph, authorized demonstrations or services shall be
defined as, but not limited to, ... any oration or similar
conduct to assembled groups of people, unless the oration is
part of an authorized service; the display of any placards,
banners, or foreign flag on VA property unless approved by
the head of the facility or designee; ... and partisan
activities, i.e. those involving commentary or actions in
support of, or in opposition to, or attempting to influence,
any current policy of the Government of the United States,
or any private group, association, or enterprise

[2] The relevant portions of the Flag Manual provide:

1. Flag Etiquette and Display
b. Primary flags authorized for public display in national
cemeteries are the United States flag, the VA's
Distinguishing flag, State flags, the POW/MIA flag and,
under limited circumstances, the Confederate flag.
...
6. The Flag of the Confederate States of America (CSA)
a. The Flag of the Confederate States of America (CSA) will
be displayed in national cemeteries only to represent
respect for those decedents who served in the armies of the
CSA during the Civil War.  As such, the display of the
Confederate flag is limited to ... Memorial Day and, in

3

one-page Confederate flag policy ("Flag Policy"),[3] which
specifically regulate the display of various flags at VA national
cemeteries.

Plaintiff, a descendant of a Confederate soldier held
prisoner at Point Lookout and a member of various confederate
historical organizations, including the Sons of Confederate
Veterans ("SCV"),[4] sought to display, beginning August 30, 2000,
and daily thereafter, between the hours of 9:00 a.m. and 6:00
p.m., a full-sized, historically accurate Confederate flag from
its own flag pole at Point Lookout. See August 17, 2000 Griffin
Letter. Plaintiff, in his request, states that he, with the

_____

States where it is officially observed, Confederate Memorial
Day.
b. The display of the Confederate flag in national
cemeteries is allowed only under the sponsorship of a local
service or historic organization....
c. The Confederate flag is to be subordinate to the United
States flag in size and prominence of display....
7. The League of Families' POW/MIA flag
a. The official League of Families' POW/MIA flag is
authorized for display in national cemeteries. The POW/MIA
flag is displayed during daylight hours at all national
cemeteries on Memorial Day, Veterans Day and National
POW/MIA Recognition Day. The flag may be flown more
frequently, or daily, at cemeteries where its display is
promoted and supported by local interest groups.
b. The POW/MIA flag is not displayed subordinate to the
United States flag....

[3]The Flag Policy restates the Flag Manual's restrictions on
the display of Confederate flags.

[4]The SCV is an organization devoted to the preservation of
the history of Confederate soldiers. The SCV supports the daily
display of a historically accurate Confederate flag from its own
flag pole at Point Lookout. See Motion at 7.

4

assistance of the SCV, will "provide the flag pole and the flag, as well as all labor necessary" to place and remove the flag on a daily basis. Id. Plaintiff's request was denied on the ground that the Flag Manual permits display of the Confederate flag "only on Memorial Day and, in States where it is officially observed, Confederate Memorial Day." August 24, 2000 Pohlman Letter.

In light of this denial, Plaintiff brought suit seeking declaratory and injunctive relief[5] on the grounds that: (1) the Flag Restrictions, facially and as applied, are improper content and viewpoint restrictions of speech in violation of the First and Fifth Amendments; (2) the Flag Restrictions are unreasonable in the context of Point Lookout; (3) 38 C.F.R. § 1.218(a)(14), facially and as applied, violates the First and Fifth Amendments because it lacks proper procedural safeguards; (4) the Flag Restrictions are unconstitutionally overbroad; (5) the Flag Restrictions, facially and as applied, deny equal protection to speakers who engage in forms of speech related to the Confederate flag; and (6) the portions of the Flag Restrictions imposing different standards on the Confederate Flag, as compared to other "primary" flags,[6] are unconstitutionally vague.

_____

[5]Plaintiff seeks no monetary damages other than that of "reasonable attorneys' fees and costs of suit." Complaint at 14.

[6]Pursuant to the Flag Manual, the primary flags are: the United States flag, the VA's Distinguishing flag, State flags,

5

Plaintiff then filed his motion seeking a preliminary injunction to prohibit "defendants from interfering with Plaintiff's display of a full-size, historically accurate Confederate flag at [Point Lookout], on a daily basis, from its own flag pole located near the Federal Monument."[7]  Motion at 34. Defendants not only opposed Plaintiff's motion but also moved for summary judgment.  Defendants, in their opposition, contend that they are entitled to summary judgment on the following grounds: (1) this Court is without jurisdiction to hear a challenge to the constitutionality of 38 C.F.R. § 1.218(a)(14); and (2) the Constitution does not require the daily display of the Confederate flag at Point Lookout because (i) Plaintiff has no right to require the government to engage in speech and (ii) the government has a compelling interest in avoiding a message of racial intolerance or divisiveness on federal property.

A hearing was held on November 30, 2000.  Under Fed. R. Civ. P. 65, a hearing on a motion for preliminary injunction may be consolidated with a trial on the merits.  At the hearing, the

---

the POW/MIA flag and, under limited circumstances, the Confederate flag.

[7]This request was amended to include Plaintiff's acquiescence to the placement of the flag at "any reasonable location" within Point Lookout, with a preference for a position near either the state or federal monument.  Plaintiff's Supplemental Memorandum at 1.  Plaintiff also sought to add "a light so that the flag can be flown and made visible at night." Id.

6

parties went beyond the issues surrounding the necessity of a preliminary injunction and fully addressed the merits of the case.  Thus, the Court will proceed directly to the merits.

## II.  DISCUSSION

### A.  38 C.F.R. § 1.218(a)(14)

#### 1. Facial Challenge

Plaintiff asserts that 38 C.F.R. § 1.218(a)(14), on its face, is an unconstitutional prior restraint on speech because it: (1) vests unlimited discretion in VA officials to prohibit speech; (2) fails to require prompt decisions on requests to "speak"; and (3) improperly places the burden on the speaker to initiate court proceedings to secure the right to speak.  See Motion at 17-22.  Defendants do not address the merits of Plaintiff's challenge to the regulation; instead, Defendants assert that such a challenge is not properly before this Court as exclusive jurisdiction lies with the Court of Appeals for the Federal Circuit.

Permissibility of judicial review of rules and regulations, such as 38 C.F.R. § 1.218, is governed by 38 U.S.C. § 502.  Under section 502, "[a]n action of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers ... is subject to judicial review.  Such review shall be in accordance with Chapter 7 of title 5 and may be brought only in the United States Court of Appeals for the Federal Circuit."  The parties do not dispute

7

that section 553 specifically exempts matters relating to public property, such as Point Lookout, from the purview of section 502. This exemption, however, is negated by the application of section 552(a)(1), which covers rulemaking. See Chinnock v. Turnage, 995 F.2d 889, 893 (9th Cir. 1993) (stating that under 38 U.S.C. § 502, VA rulemaking is subject to judicial review only in the Federal Circuit).

In an unpersuasive plea, Plaintiff requests that this Court disregard the statute and exercise jurisdiction in the name of "fairness." See Pl. Reply at 39. The Court is, however, without authority to grant such a request. The statute is clear that "[f]acial constitutional attacks on regulations promulgated by the Secretary may be pursued in one of two ways - either in accordance with the procedure set forth in the Veterans' Judical Review Act [not applicable here], or directly in the Federal Circuit Court of Appeals as permitted by 38 U.S.C. § 502." Hall v. U.S. Dep't Veterans' Affairs, 85 F.3d 532, 534 (11th Cir. 1996).

For the foregoing reasons, the Court holds that the facial constitutional challenge to 38 C.F.R. § 1.218(a)(14) may only be brought in the Federal Circuit Court of Appeals.

## 2. "As Applied" Challenge

In addition to the facial challenge, Plaintiff also asserts an "as applied" challenge to 38 C.F.R. § 1.218(a)(14). An as

8

applied challenge differs from a facial challenge in that it looks to the constitutionality of the statute or regulation as it is applied to a particular set of circumstances. In addition, the remedy is very different: "If a statute is unconstitutional as applied, the State may continue to enforce the statute in different circumstances ..., but if a statute is unconstitutional on its face, the State may not enforce the statute under any circumstances." Women's Med. Prof'l Corp. v. Voinovich, 130 F.3d 187, 193 (6ᵗʰ Cir. 1997), cert. denied, 523 U.S. 1036 (1998). Here, Plaintiff argues that it is the application of the regulation, via the Flag Manual and Flag Policy, to his specific request that is unconstitutional.

Defendants' counter with the argument that another statute, 38 U.S.C. 7292(d)(1),(2),[8] precludes jurisdiction of this Court over the as applied challenge as well. The Court disagrees. Section 7292 (d)(1),(2) applies only to actions brought under that chapter, i.e., chapter 72, which confers jurisdiction on the Federal Circuit over appeals from decisions of the Court of

---

[8]In pertinent part, 38 U.S.C. § 7292(d)(1),(2) reads:
The Court of Appeals for the Federal Circuit shall decide all relevant questions of law, including interpreting constitutional and statutory provisions.... Except to the extent that an appeal under this chapter presents a constitutional issue, the Court of Appeals may not review (A) a challenge to a factual determination, or (B) a challenge to a law or regulation as applied to the facts of a particular case.
(Emphasis added).

9

Veterans Appeals. This case involves no such appeal. Therefore, section 7292(d)(1),(2) is inapplicable.

In addition to there being no statutory bar to this Court exercising jurisdiction over the as applied challenge, case law supports the contention that this Court is, in fact, the proper court to hear such a challenge. First, the direct review provisions of section 502 are to be read narrowly. See Hilario v. Secretary, Dep't of Veterans Affairs, 937 F.2d 586, 588 (Fed. Cir. 1991). Under the direct review provisions, the Federal Circuit "may review the VA's procedural and substantive rules, any amendments to those rules, and the process in which those rules are made or amended." Disabled American Veterans v. Gober, 234 F.3d 682, 688 (Fed. Cir. 2000). Application of a rule is not, however, "rulemaking" to which section 552(a)(1) refers because "rulemaking is legislative in nature, is primarily concerned with policy considerations for the future rather than the evaluation of past conduct, and looks not to the evidentiary facts but to policy-making conclusions to be drawn from the facts." LeFevre v. Secretary, Dep't of Veterans Affairs, 66 F.3d 1191, 1196 (Fed. Cir. 1995), cert. denied, 517 U.S. 1188 (1996) (citations omitted). See also Hilario, 937 F.2d 586 (Fed. Cir. 1991) (holding that section [502] confers no jurisdiction on the Federal Circuit to hear a challenge to the application of a veterans' benefits statute to the facts of a particular claim).

10

Defendants' denial of Plaintiff's request was not, however, based directly on 38 C.F.R. § 1.218(a)(14). Instead, the decision to deny the request cited the Flag Manual and Flag Policy, see Aug. 24, 2000 Pohlman Letter and Aug. 28, 2000 Rapp Letter, which are based, in part, on 38 C.F.R. § 1.218(a)(14). See Flag Policy. Therefore, 38 C.F.R. § 1.218(a)(14) will be addressed only to the extent necessary to evaluate Defendants' actions under the Flag Manual and Flag Policy.

## B. Flag Manual and Flag Policy

The issue presented is whether Plaintiff has a First Amendment right to fly a Confederate flag at Point Lookout. In Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788 (1985), the Supreme Court outlined the appropriate framework for analyzing an alleged First Amendment infringement. First, the court must decide whether the speech at issue is speech protected by the First Amendment. If it is, the court must then "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Finally, the court "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." Id. at 797. Applying this analysis, this Court finds that Plaintiff's speech is protected speech occurring in the context of a nonpublic forum and that Defendants' reasons for excluding the speech fail to satisfy

11

either the reasonableness or view-point neutrality requirements. Accordingly, Plaintiff's request for Declaratory and Injunctive Relief will be granted.[9]

## 1. Display of Flag is Protected Speech

The first issue is whether the speech at issue, here the display of the Confederate flag, is the type of speech protected by the First Amendment. Defendants do not contest this issue. Flags have long been recognized as "a form of symbolism comprising a primitive but effective way of communicating" worthy of protection by the First Amendment. Spence v. State of Washington, 418 U.S. 405, 410 (1974). See also Texas v. Johnson, 491 U.S. 397, 404-06 (1989); Sons of Confederate Veterans, Inc. v. Glendening, 954 F.Supp. 1099, 1102 (D. Md. 1997) (reiterating that "flags and other symbols are entitled to First Amendment protection as a variant of speech").

## 2. Forum Analysis

Whether or not the Flag Manual and Flag Policy are valid

---

[9]The form of relief granted is that Plaintiff shall be permitted to display, on a daily basis between the hours of 9:00 a.m. and 6:00 p.m., a full-sized, historically accurate Confederate battle flag from its own pole at Point Lookout. The pole shall be at least three feet lower than the U.S. flagpole at Point Lookout. The placement of the flag is to be agreed upon by the parties but in close proximity to either the Federal or State monument. Plaintiff is to provide all material and labor necessary for the daily placement and removal of the flag. A sign shall be erected at the base of the flag pole clearly indicating that the display of the Confederate flag is provided by and supported by a private party or parties.

12

restrictions on Plaintiff's speech depends, first, on whether Point Lookout is a traditional public forum, a designated public forum, or a nonpublic forum.[10]

Traditional public fora are places which "by long tradition or government fiat have made devoted to assembly and debate." Perry Ed. Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45 (1983). Examples include places such as public streets, sidewalks, and parks. A restriction on speech in traditional public fora must withstand strict scrutiny, i.e., the restriction must be narrowly tailored to effectuate a compelling government interest. See id. Point Lookout is undisputedly not a traditional public forum.

A designated public forum is created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects. Id. The factors used to determine whether the government's intent was to "designate" a place as a public forum include: (1) the policy and practice of the government; (2) the nature of the property; (3) its compatibility with expressive activity; and (4) the extent of

_____

[10]Alternatively, Defendants assert that Point Lookout is actually a non-forum and, therefore, restrictions on speech are valid as long as they are not "arbitrary, capricious, or invidious." Opp. at 19. Defendants, however, provide no case law in support of this assertion; and it is noted that Defendants themselves have opened national cemeteries, including Point Lookout, for some, albeit limited, forms of speech.

13

the use granted. See Cornelius, 473 U.S. at 802; Claudio v. United States, 836 F.Supp. 1219, 1224 (E.D.N.C. 1993), aff'd, 28 F.3d 1208 (4ᵗʰ Cir. 1994) (citations omitted). Restrictions on speech in a designated public forum must also satisfy the strict scrutiny standard. Perry, 460 U.S. at 46.

A nonpublic forum is public property which is not by tradition or designation a forum for public communication. "Merely allowing some speech on property that is not a traditional public forum does not automatically create a designated forum." Warren v. Fairfax County, 196 F.3d 186, 193 (4ᵗʰ Cir. 1999). Rather, the "government may retain nonpublic forum status by allowing selective, permission-only access to the forum." Id. Examples of nonpublic fora include prisons and military bases.

In a nonpublic forum, restrictions on speech are subject to the reasonableness test. Under this test, "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius, 473 U.S. at 806. See also United States v. Kokinda, 497 U.S. 720, 730 (1990) (articulating that restrictions on speech in a nonpublic forum "must be reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view").

14

Plaintiff asserts that national cemeteries in general and Point Lookout in particular are designated public fora because Defendants have made the cemeteries generally available to classes of speakers, including those who wish to display flags. Defendants counter with the argument that Point Lookout is a nonpublic forum because, outside of the daily display of the U.S. flag and the display of the POW/MIA flag on days designated by statute,[11] the only form of private expressive activity permitted at Point Lookout is the annual 90-minute ceremony held by the SCV. According to Defendants, the dispositive issue is not what could take place at Point Lookout, but what, in fact, does take place. While the Court allows that this is an important factor, it is not the only factor. After taking the other factors into consideration, the Court agrees with Defendants that Point Lookout is a nonpublic forum.

Of primary importance is the fact that Point Lookout, and national cemeteries in general, are not "generally available." Instead, those who wish to display a flag outside of the limited number of specified days must seek permission to do so. The same is true of a party desiring to engage in some other form of

---

[11]Technically, the display of the U.S. flag is a nonfactor because it constitutes government, not private, speech. Additionally, because the POW/MIA flag, at Point Lookout, is displayed only on the days designated by statute, it too constitutes government, not private, speech. If the POW/MIA flag were, instead, displayed daily with the support of a local organization, then it would be private speech.

15

expressive activity, such as the annual SCV ceremony.  By
limiting expressive activity to "selective, permission only
access" the VA may retain nonpublic forum status for Point
Lookout, as well as all other national cemeteries.  The
designation of Point Lookout as a nonpublic forum is also
supported by the fact that the nature of the property is not
compatible with expressive activity.  "It certainly cannot be
said that cemeteries have traditionally been used for assembly
and the free exchange of ideas.  The primary purpose of
cemeteries is not to facilitate the free exchange of ideas but,
rather, to provide a place for citizens to bury and honor their
dead."  Warner v. City of Boca Raton, 64 F.Supp.2d 1272, 1291
(S.D. Fla. 1999).

Having determined that Point Lookout is a non-public forum,
the restrictions on the requested display of the Confederate flag
will be upheld only if they are reasonable in light of the
purpose served by the forum and are viewpoint neutral.

## 3. Reasonableness Requirement

A valid restraint on speech in a nonpublic forum must be
reasonable, with reasonableness measured in the context of the
purpose served by the forum.  See Cornelius, 473 U.S. at 806.

Defendants' argument that their actions are reasonable is
two pronged: first, that the refusal is reasonable given
Defendants statutory responsibility to preserve Point Lookout,

16

and all national cemeteries, as "national shrines" and, second, that the refusal is also reasonable given the government's interest in avoiding any perception that the government endorses or condones racial intolerance or discrimination. Plaintiff attacks both contentions with the simple rebuttal that Point Lookout's sole purpose is to honor Confederate dead and that the flying of the Confederate flag in that context is inherently reasonable.

a. National Shrine Argument

38 U.S.C. § 2403(c) mandates that all national cemeteries "shall be considered national shrines as a tribute to our gallant dead." Pursuant to this statute, Defendants argue that their opposition reasonably seeks to preserve the tranquility and dignity of Point Lookout by prohibiting conduct that might create controversy or invite conflict. See Def. Reply at 12. There are two primary flaws in this argument. First, Defendants have provided no evidence that the display will create controversy or disrupt the tranquility and dignity of Point Lookout. The record, in fact, refutes any such concern as the Confederate flag was flown daily at Point Lookout for almost four years[12] without any complaints, protests or conflicts. Defendants do not dispute that there were no complaints during this time period. Rather,

_____

[12]The Confederate flag was flown daily at Point Lookout between 1994 and May, 1998.

17

Defendants focus on the fact that the daily display was not authorized by the VA but was, instead, "attributable to the ultra vires action of a Veterans Affairs employee." Def. Reply at 11. The genesis of the display, however, does not alter the fact that for four years the display was not objected to by passers-by, the very group that Defendants now claim will be offended.

Second, Defendants overlook that the flying of the Confederate flag in an all Confederate cemetery affirms the statutory mandate that national cemeteries shall be "shrines as a tribute to our gallant dead." See 38 U.S.C. § 2403(c). Given the discrete context of Plaintiff's proposed display, along with the absence of any complaints during the prior years encompassing a similar display, one is hard put to imagine a rationally thinking person attributing a racial or discriminatory message to it.

b. Government Speech Argument

First, Defendants argue that the First Amendment is not applicable because the "speaker" is the government and the First Amendment protects only private expression. See Serra v. U.S. General Services Admin., 847 F.2d 1045, 1048 (2nd Cir. 1988). In support of this contention, Defendants cite several cases, including Serra and PMG Int'l Div., LLC v. Cohen, 57 F.Supp.2d 916 (N.D. Cal. 1999). These cases, however, are not apposite to the issues here.

18

In Serra, the Second Circuit held that the government's removal of a government owned sculpture from federal property did not violate the artist's First Amendment rights. The Second Circuit stated that the purpose of the First Amendment is to protect private, not governmental, expression. Therefore, nothing precludes the government from controlling its own expression or that of its agents. Serra, 847 F.2d at 1048. The Second Circuit went on to say that the artist "relinquished his own speech rights" when he sold the sculpture to the government; had the artist wanted to retain some control over the placement of the sculpture, he could have bargained for those rights. Id. at 1049.

Similarly, in PMG Int'l, a magazine publisher asserted that his First Amendment rights had been violated by the government's refusal to purchase and resell "adult" magazines at a military exchange. The District Court held that the government has a right to decide what it is going to purchase and disseminate and that the First Amendment places no limitations on that right. PMG Int'l, 57 F.Supp.2d at 919.

In Serra and PMG Int'l, the government was the actor and owner of the real and personal property at issue. Conversely, in the present case, Defendants are not being asked to expend their money or to act at all but, rather, merely to "step back and allow the third parties to use the government property without

19

interference." PMG Int'l, 57 F.Supp.2d at 920. The issue in the present case involves private speech on government property, which implicates the protections provided by the First Amendment.

Defendants argue, alternatively, that, if the speech is private expression, their actions are nonetheless reasonable because the speech in question would be perceived as government speech. Therefore, Defendants have an interest in avoiding the perception that the government condones or advances racial intolerance or divisiveness. In making this argument, Defendants rely heavily on County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573 (1989).

In Allegheny, the Supreme Court held that the display of a creche on the interior grand staircase of the Courthouse was unconstitutional because the display has the impermissible effect of indicating government endorsement of religion, in violation of the Establishment Clause. In making this determination, the Court indicated that the primary question is that of "what viewers may fairly understand to be the purpose of the display." Id. at 595. That inquiry, of necessity, turns upon the context in which the contested object appears. Id. The Court also looked at the prominence of the contested object in the display, see id. at 580-81, 617, and whether something in the context of the display detracts from the possible prohibited message. Id. at 598. In Allegheny, the Court found: (1) that in the context

20

of the grand staircase, viewers could reasonably perceive the display as the government's endorsement of religion; (2) that the government added to and enhanced the display, thus adding to the perception that the display was sponsored by the government; (3) that there was nothing in the context of the display to detract from the prohibited message, i.e., government endorsement of religion; and (4) that the creche was the dominant element of the display. Lastly, the Court held that the presence of a sign indicating that the creche had been donated by the Holy Name Society was insufficient to negate the perception of government endorsement of religion because the Establishment Clause "also prohibits the government's support and promotion of religious communications by religious organizations." Id. at 600.

Defendants' reliance on Allegheny is misplaced. The facts and circumstances of the present case distinguish it from Allegheny in several ways. First, the present case does not involve religion or religious speech. Therefore, the broad sweep of the Establishment Clause is not implicated. Second, the context of the display militates against any potential that a prohibited message of racial intolerance could be inferred. As already noted, in the context of a Point Lookout, a cemetery established for the sole purpose of honoring Confederate dead, the only rational assumption is that the flag is being displayed because it is the flag under which those buried at Point Lookout

21

fought and died.   Additionally, the proposed subordinate
positioning of the Confederate flag to the U.S. flag and its
positioning in the shadow of the other monuments, simply presents
an unpretentious recognition that those who are buried there died
as members of the Confederate Army.   See id. at 617 (holding that
Chanukah Menorah outside City-County building was in the shadow
of other items and, therefore, was not impermissible under the
Establishment Clause).   Lastly, in the present case, a
prominently displayed sign stating that the Confederate flag is
provided and supported solely by the efforts of private citizens
should remove any vestige of concern that someone might interpret
the display as inappropriate government speech.   In Allegheny,
the Court did not say, as Defendants appear to argue, that a sign
was never adequate, only that in the circumstances of the
Establishment Clause and the particular context at issue, a sign
was not sufficient to negate the appearance of government
endorsement of religion.

## 4. Viewpoint Neutrality Requirement

"Regardless of the type of forum, any governmental
regulation of speech must be viewpoint-neutral."   Sons of
Confederate Veterans, Inc. v. Glendening, 954 F.Supp. 1099, 1102
(D. Md. 1997).   The existence of reasonable grounds for limiting
access to a nonpublic forum "will not save a regulation that is
in reality a facade for viewpoint based discrimination."

22

Cornelius, 473 U.S. at 811. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Sons of Confederate Veterans, 954 F.Supp. at 1104 (quoting Texas v. Johnson, 491 U.S. 397, 414 (1989)). In all cases, the appropriate focus of the viewpoint inquiry examines whether the proposed speech is "otherwise permissible" in a given forum. Sons of Confederate Veterans, 954 F.Supp. at 1103.

Defendants argue that their decision was not an attempt to stifle a particular viewpoint but was, rather, based on the desire to prevent disruption of the reverence and decorum of national cemeteries and to avoid any perception that the government itself expresses a viewpoint. Conversely, Plaintiff asserts that the Flag Restrictions are viewpoint based and that the suppression of the Confederate flag is a suppression of a particular viewpoint attributed to the Confederate flag by Defendants. The Court agrees.

Defendants argument undercuts its claim that the decision to deny Plaintiff's request was viewpoint neutral. The Confederate flag does not represent the same thing to everyone. As Judge Smalkin of this Court recently observed:

> "There are citizens of all races who view the flag as a symbolic acknowledgment of pride in Southern heritage and ideals of independence. Likewise, there are citizens of all races who perceive the flag as embodying

23

> principles of discrimination, segregation, white
> supremacy, and rebellion. Still other citizens
> either have no knowledge of the flag's ... [history]
> or have no interest in it."

Sons of Confederate Veterans, 954 F.Supp. at 1103 (quoting

Coleman v. Miller, 912 F.Supp. 522, 530 (N.D. Ga. 1996)). Yet,

Defendant's continual reference to the Confederate flag as a

symbol of racial intolerance and divisiveness, see, e.g., Opp. at

16, 29, 30, 33; Def. Reply at 1, 12, 13, 15, clearly demonstrates

that Defendants are choosing, and advancing, the viewpoint of

those offended by the flag over the viewpoint of those proud of

the flag. See Sons of Confederate Veterans, 954 F.Supp. at 1103-

04. This preference is not viewpoint neutral and is, therefore,

impermissible. See R.A.V. v. City of St. Paul, Minnesota, 505

U.S. 377, 391 (1992) (stating that the "First Amendment does not

permit [the government] to impose special prohibitions on those

speakers who express views on disfavored subjects").

Additionally, regulations that strike at an entire class of

viewpoints, such as those here, have been repeatedly rejected.

See Rosenberger v Rector & Vistors of University of Virgina, 515

U.S. 819, 831-32 (1995); Lamb's Chapel v. Center Moriches Union

Free School District, 508 U.S. 384 (1993); Sons of Confederate

Veterans, 954 F.Supp. at 1103. The rationale is that such broad-

based regulations are often simply a mask for viewpoint

discrimination. See Sons of Confederate Veterans, 954 F.Supp. at

1103. Here, Defendants have prohibited all viewpoints related to

24

the display of the Confederate flag. The fact that Defendants
repeatedly refer to the Confederate flag as a symbol of racial
divisiveness and intolerance illustrates that the regulations are
an attempt to regulate speech that Defendants find offensive.
Such censorship on the part the government is impermissible under
the First Amendment.

## 5. **Content-Based Restrictions**

The government argues that the Flag Manual and Flag Policy
are permissible time, place, and manner restrictions. However,
content-based time, place, and manner restrictions are
presumptively invalid. R.A.V., 505 U.S. at 382. Such
restrictions must be narrowly drawn to effectuate a compelling
state interest. Perry, 460 U.S. at 46.

The restrictions on the Confederate flag are not content-
neutral because they treat the Confederate flag differently than
other flags, such as the POW/MIA flag. The Flag Manual permits
the POW/MIA flag to be displayed daily at Point Lookout, or any
other national cemetery, with the support cf a local interest
group. See Flag Manual at § 7(a). This is true even if the
POW/MIA flag has no contextual relationship to the forum, such as
if it were flown daily at Point Lookout. Yet, under the same
Flag Manual, as well as under the corresponding Flag Policy, a
local interest group is not permitted to display the Confederate
flag at Point Lookout on a daily basis - even though the very

25

purpose of Point Lookout is to honor the Confederate dead.   The only difference between the Confederate flag and the POW/MIA flag is what each flag symbolizes in the eyes of Defendants.   Thus, the Flag Manual and Flag Policy, as applied to the Confederate flag in the context of Point Lookout, are impermissible content-based restrictions in violation of the First Amendment.

## III. CONCLUSION

For the foregoing reasons, an Order will issue granting Plaintiff's request for declaratory and permanent injunctive relief.   Because this would appear to resolve all issues pending in this litigation, this Order will be a final order.

William M. Nickerson
United States District Judge

Dated: January 29 , 2001

26